Todd A. Seaver (SBN 271067)
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: tseaver@bermantabacco.com

Vincent Briganti (pro hac vice forthcoming)
Christian Levis (*pro hac vice* forthcoming)
Peter Barile (*pro hac vice* forthcoming)
Amanda Fiorilla (*pro hac vice* forthcoming)
Noelle Feigenbaum (*pro hac vice* forthcoming)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
pbarile@lowey.com
afiorilla@lowey.com
nfeigenbaum@lowey.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN PISTACCHIO, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>v.<br><br>APPLE INC., a California corporation.<br><br>                    Defendants. | Case No.: _____<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**CLASS ACTION**</u><br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

NATURE OF THE ACTION.................................................................................................. 1

JURISDICTION AND VENUE............................................................................................. 2

INTRADISTRICT ASSIGNMENT ....................................................................................... 3

PARTIES ................................................................................................................................ 3

SUBSTANTIVE ALLEGATIONS ........................................................................................ 4

I.      The History of Apple Inc. and the App Store .......................................................... 4

II.     The Rise of Mobile Gaming..................................................................................... 5

III.    The Rise of Mobile Gaming Subscription Services ................................................. 7

IV.     The Relevant Market ................................................................................................ 9

V.      Apple's Monopoly Power in the iOS Subscription-Based Mobile Gaming Services
        Market .................................................................................................................... 10

VI.     Apple's Anticompetitive Conduct in the iOS Mobile Gaming Subscription Services
        Market .................................................................................................................... 12

        A.      Apple Imposes Technical Restrictions on iOS Devices. .......................... 12

        B.      Apple Imposes Contractual Restrictions on Developers. ......................... 12

        C.      Apple Abuses its App Store Review Guidelines in order to Protect its
                Monopoly in the Market for iOS Subscription-Based Mobile Gaming
                Services. .................................................................................................... 14

        D.      Apple Outright Rejected Competing Subscription-Based Mobile Gaming
                Services. .................................................................................................... 17

VII.    There are no Procompetitive Justifications for Apple's Misconduct ................................. 18

VIII.   Anticompetitive Effects in the iOS Subscription-Based Mobile Gaming Services
        Market .................................................................................................................... 21

IX.     Apple's History of Monopolistic Abuse ................................................................ 23

ANTITRUST INJURY ........................................................................................................ 26

CLASS ACTION ALLEGATIONS..................................................................................... 27

CLAIMS FOR RELIEF ....................................................................................................... 29

        FIRST CLAIM FOR RELIEF ................................................................................ 29

        SECOND CLAIM FOR RELIEF............................................................................ 30

THIRD CLAIM FOR RELIEF ............................................................................ 31

FOURTH CLAIM FOR RELIEF........................................................................ 32

FIFTH CLAIM FOR RELIEF............................................................................ 33

SIXTH CLAIM FOR RELIEF ........................................................................... 34

PRAYER FOR RELIEF........................................................................................... 35

DEMAND FOR JURY TRIAL................................................................................ 36

Plaintiff John Pistacchio ("Plaintiff"), individually and on behalf of all others similarly situated, asserts the following against Defendant Apple Inc. ("Apple" or "Defendant") based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

## NATURE OF THE ACTION

1.      Video games achieved mainstream popularity in the 1970's and have remained popular ever since, ultimately evolving into a multi-billion-dollar industry expected to generate $159.3 billion in revenue in 2020 alone.

2.      One segment of the industry is mobile gaming. Mobile gaming has grown into one of the largest segments of the gaming market, generating about $49 billion in revenue in 2019, approximately 60% of the revenue for the global video game market that year. In 2020, mobile gaming grew exponentially as an increasing number of people became confined to their homes due to shelter-in-place orders as a result of the COVID-19 pandemic. For example, in the first quarter of 2020, more than 3 billion games were installed on devices running Apple "iOS," the operating system that powers Apple's smartphones and tablets, including the iPhone and iPad.

3.      Seeking to further monetize the mobile gaming industry, multiple companies have developed subscription-based mobile gaming services. These services allow subscribers to access game titles across multiple devices, including smartphones and tablets, for a single monthly fee.

4.      One subscription-based mobile gaming service is "Apple Arcade." Apple launched Apple Arcade in September 2019, which is projected to have 12 million subscribers by the end of 2020. Shortly thereafter, Microsoft, Facebook, and others launched competing subscription-based mobile gaming services.

5.      Apple acted quickly to monopolize the market for iOS subscription-based mobile gaming services through a series of anti-competitive acts, including preventing Microsoft and Facebook from offering their services through the Apple "App Store," the only place where iOS users can access competing subscription-based mobile gaming services.

6.      In doing so, Apple has foreclosed competition in the iOS subscription-based mobile gaming services market. As the self-appointed sole provider of subscription-based mobile gaming services on iOS, Apple possesses monopoly power in the relevant market. There are no pro-

competitive justifications for excluding other subscription-based mobile gaming services from the market or any of Apple's other misconduct, as described herein.

7.      Plaintiff is a subscriber to Apple Arcade and pays Apple a recurring subscription charge for access to gaming content. As a direct result of Apple's anticompetitive conduct, Plaintiff has been forced to pay supracompetitive prices for Apple Arcade. Moreover, by unlawfully foreclosing competition, Apple has eliminated consumer choice, stymied innovation, and reduced quality of service. Given the persistent, pervasive, and secretive nature of Apple's misconduct, Plaintiff believes that further evidentiary support for his claims will be unearthed after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

8.      The Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337. This case arises under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

9.      The Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C §1332(d), because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because a significant portion of putative class members are citizens of a state different from the citizenship of Defendant.

10.      The Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1337.

11.      This Court has general personal jurisdiction over Defendant because Defendant is incorporated in California and has its principal place of business located in Cupertino, California in this District Additionally, Defendant is subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in this State.

12.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the conduct described in this Complaint was carried out in this District. Furthermore, Defendant is headquartered in this District and subject to personal jurisdiction in this District.

---

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL                                    2

**INTRADISTRICT ASSIGNMENT**

13.　　Pursuant to Civil Local Rule 3-2(c), this antitrust case shall not be assigned to a particular Division of this District, but shall be assigned on a District-wide basis.

**PARTIES**

**A.　　Plaintiff**

14.　　Plaintiff John Pistacchio ("Plaintiff") is a natural person and citizen of the State of New Jersey and a resident of Essex County. Plaintiff is the owner of an Apple iPhone. On March 21, 2020, Plaintiff paid $4.99 to subscribe to Apple Arcade. Plaintiff has continued to pay $4.99 per month from March 21, 2020 through present.

15.　　As a result of Apple's misconduct, as alleged herein, Plaintiff has suffered and will continue to suffer injury, including monetary losses as a result of paying supracompetitive subscription prices for Apple Arcade.

16.　　Plaintiff has also been harmed as a result of limited choice, stymied innovation, and reduction of quality of service associated with subscription-based mobile gaming services on iOS as a result of Apple's anticompetitive conduct.

**B.　　Defendant**

17.　　Defendant Apple Inc. is a California corporation, organized and existing under the laws of the State of California, with its principal place of business at One Apple Park Way, Cupertino, CA 95014.

18.　　Apple is the largest public company in the world, with a current market capitalization of close to $2 trillion. Apple designs, markets and sells smartphones (including the iPhone), personal computers (including Macs), tablets (including the iPad), wearables and accessories, and sells a variety of related services, including Apple Arcade, Apple's gaming subscription service. Apple also owns and operates the App Store including contracting with all app developers that distribute their apps through the App Store.

## SUBSTANTIVE ALLEGATIONS

**I.     The History of Apple Inc. and the App Store**

19.     Since the turn of the century, Apple has grown into the largest company by market capitalization in the world. Since 2013, the company has held a spot among the top ten Fortune 500 companies. In 2018, Apple became the first American company to exceed $1 trillion in market capitalization. Two years later, Apple is now worth nearly $2 trillion.

20.     Apple's most popular product is its iPhone. Apple announced the release of the iPhone in 2007. The iPhone is a smartphone that has the functionality to perform an array of activities, such as listen to music, video chat, check the weather, and browse the internet, among other things. Within a year, the iPhone's popularity made Apple the third-largest supplier of mobile handsets in the world. Apple recently released the iPhone 11 Pro, which it dubs "the world's most powerful personal device" that "pushes the boundaries of what a smartphone can do."[1] To date, Apple reportedly sells more than 200 million iPhones annually and there are over one billion active iPhone users.

21.     Apple's iPhone, like all smartphones, requires an operating system or "OS" to support its functionality. All iPhones run on Apple's proprietary OS called iOS. Apple also manufacturers a number of other devices, including tablets such as the iPad, which also run iOS. Collectively, these are referred to as iOS devices.

22.     Apple's iOS devices come pre-loaded with certain apps made exclusively by Apple. Apple's pre-installed apps include a clock, weather, picture, GPS map, and web browsing app, among others.

23.     However, users desire more than the apps that Apple pre-installs. For these reasons, just a year after launching the iPhone, in 2008, Apple released the App Store—a digital marketplace which allows third-party programmers to sell their apps for the iPhone and other Apple iOS devices, such as the iPad. Users can download an app for virtually anything, from money management to food diaries, and everything in between.

---

[1]     *iPhone 11 Pro*, APPLE, https://www.apple.com/iphone-11-pro/ (last visited Aug. 17, 2020).

24.     While some apps are available for free, other apps cost money to download. To date, the App Store offers approximately 2 million apps available for download.

25.     The App Store allows app developers to cater to a massive worldwide market. Today, over 20 million registered developers sell their work through the App Store, which is visited by 500 million consumers a week.

26.     The iOS userbase is enormous. There are nearly one billion iPhone users worldwide and over 1.5 billion active iOS devices, including both iPhones and iPads. Typically, these users will use only iOS devices and will not also use mobile devices with a different OS.

27.     The App Store makes up a significant portion of Apple's "services" business. In 2017, Tim Cook, CEO of Apple, announced a plan to double the size of its services business by the end of 2020. Apple met that goal by July of this year. Apple has continued to focus on growing its services business as a way to boost revenue as hardware sales decline. To date, Apple's services account for 18% of its total revenue and grows at a much faster pace than its products business. Since 2017, Apple's services revenue has increased more than 41%.

28.     With respect to the App Store specifically, Apple is projected to net over $17 billion for fiscal year 2020. Phillip Shoemaker, the former director of app review for the App Store, estimates that it costs Apple less than $100 million to operate the App Store.

29.     Mobile gaming services in particular have contributed significantly to Apple's success in its services business. In fact, the most important segment of the App Store is gaming apps. As reported by the *New York Times*, "games are the largest source of revenue for Apple on the App Store."[2]

## II.     The Rise of Mobile Gaming

30.     The mobile gaming industry began with the release of a mobile version of the popular arcade game *Tetris*, which came pre-installed on the Hagenuk cellphone launched in 1994.

---

[2]     Seth Schiesel, F*acebook Gaming Finally Clears Apple Hurdle, Arriving in App Store*, NEW YORK TIMES (Aug. 7, 2020), https://www.nytimes.com/2020/08/07/technology/facebook-apple-gaming-app-store.html?auth=login-email&login=email.

31.     While a handful of humble mobile games were sold on mobile phones during the late 1990's and early 2000's, the segment remained small until 2008, as compared to traditional computer and console gaming.

32.     Apple's release of the App Store heralded a new era in mobile gaming. Through the App Store, mobile game developers could sell their games to consumers, rather than being forced to first sell their games to phone carriers as they had in the past.

33.     With the rise of smartphones, mobile games have grown immensely popular. By 2011, the number of consumers purchasing mobile games in the United States alone was 80.7 million. Over the past decade, that number has almost tripled.

34.     One of the first mobile games to gain noteworthy commercial success was the game *Angry Birds*, originally released exclusively on the App Store in 2009. The popularity of this game led to the development of a multimedia franchise, including sequel games, several toy lines, multiple movies, and a children's TV series.

35.     Mobile games produce substantially more revenue than other kinds of apps because consumers are more willing to pay to download mobile games and they are more willing to make in-app purchases. Today, mobile gaming represents a multi-billion-dollar industry. In 2018, mobile gaming generated approximately $75 billion in revenue worldwide. This is expected to increase by more than $77 billion in revenue by the end of 2020.

36.     Apple has touted its App Store as "the world's most successful and vibrant gaming platform."[3] Today, over 900,000 mobile games are available on the App Store. Over 80% of revenue for apps on the App Store comes from mobile games. Indeed, of the $62 billion spent on smartphone gaming in 2019, more than half occurred on Apple devices.

37.     Given the popularity of mobile gaming, multiple companies developed subscription-based mobile gaming services designed to run on iOS. As explained herein, Apple blocked its competitors from launching these products, which would compete with Apple Arcade.

---

[3] Press Release, *Apple introduces Apple Arcade – the World's First Game Subscription Service for Mobile, Desktop and the Living Room*, BUSINESS WIRE, (March 25, 2019), https://apnews.com/press-release/pr-businesswire/caedc8e9d09d46498c390cfc0b08c14f.

### III.   The Rise of Mobile Gaming Subscription Services

38.   Subscription services have gained significant traction among consumers. Subscription services enable users to access a library of entertainment or products, such as music, movies, TV shows, or clothes, in exchange for a monthly fee.

39.   As with other subscription services, subscription-based mobile gaming services charge a recurring fee to users in exchange for access to that service's library of games. Subscription-based mobile gaming services offer players the ability to play games, create and stream gaming content, connect to gaming communities, and more across many devices.

40.   Subscription-based mobile gaming services are beneficial to both gaming publishers and consumers. For publishers, subscription-based mobile gaming services have the advantage of a steady revenue stream.

41.   Consumers also stand to benefit greatly from subscription-based mobile gaming services. Rather than being chained to bulky gaming consoles at home, consumers can pay one fee to play a myriad of games across devices through a subscription service. Should they choose, consumers can pay for more than one subscription service in order to have access to multiple gaming libraries. Moreover, the steady revenue stream provides resources to update current games and develop new games, expanding consumer choice and increasing game quality.

42.   Recognizing these benefits, in March 2019, Apple announced that it would launch Apple Arcade, it's subscription-based mobile gaming service.

43.   Apple Arcade launched on September 19, 2019. Apple Arcade costs $4.99 per month, which includes unlimited access to a wide variety of gaming content. Users also have the option of Family Share, which allows up to six family members to access Apple Arcade as part of the same monthly subscription.

44.   Once users subscribe to Apple Arcade, they are able to download Apple Arcade games from the App Store directly to their devices and access them at any time, including offline. There are no advertisements and no in-app purchases. Apple Arcade games cannot be purchased individually without the subscription.

45.     At the time of launch, Apple Arcade offered 100 new games available on Apple devices, including the iPhone, iPad, iPod touch, Mac, and Apple TV. Apple Arcade games feature cross-save, so that if a user switches from one Apple device to another in the middle of a game, the user's progress will be saved.

46.     Following the release of Apple Arcade, other companies, including Google, Facebook, and Microsoft, developed similar subscription-based mobile gaming services compatible with iOS. For example, on November 19, 2019, Google launched its subscription-based mobile gaming service, Stadia.

47.     At launch, Stadia featured 30 games. Stadia offers two subscription tiers. A free tier that offers game playing and streaming at a lower resolution. The other is a paid tier in which, for $9.99 a month, users can access Stadia games across multiple devices, including laptops, tablets and smartphone.

48.     However, iOS users cannot utilize this feature. While iOS users can download the Stadia app from the App Store to manage Stadia on other devices, Apple blocked users from being able to play games on iOS claiming that Stadia violated the App Store Review Guidelines.

49.     Apple has confirmed that it would not allow the full version of Google Stadia app on the App Store.

50.     On April 20, 2020, Facebook launched its own subscription-based mobile gaming service, Facebook Gaming. Like Apple Arcade, Facebook Gaming costs $4.99 per month and includes games for users to play. Thus, Facebook Gaming competes directly with Apple Arcade for users to subscribe to their subscription-based mobile gaming platform.

51.     Like Stadia, Apple denied Facebook Gaming access to the App Store, until Facebook agreed to strip the game-playing feature entirely from the iOS version of its app. Facebook Gaming only became available to iOS users in August 2020—four months after its initial launch and stripped of the very feature that threatened Apple Arcade.

52.     Microsoft also developed its own subscription-based mobile gaming service and began beta testing for an iOS compatible version, Project xCloud, on August 5, 2020. Microsoft was ultimately forced to abandon this project when Apple refused to allow xCloud in the App Store. A

Microsoft spokesperson announced "we do not have a path to bring our vision of cloud gaming with Xbox Game Pass Ultimate to gamers on iOS via the Apple App Store. ***Apple stands alone as the only general purpose platform to deny consumers from cloud gaming and game subscription services*** like Xbox Game Pass."[4]

53.     Every other attempt to develop competing subscription-based mobile gaming services, including Nvidia's GeForce Now, has equally been blocked. Like others, these subscription-based mobile gaming services were either rejected entirely or forced to remove key features.

54.     Thus, while more game titles are available for consumers to access on more devices than ever before, "for the more than 1 billion users of Apple's iPhone and iPad, the only real option is [Apple] Arcade."[5]

55.     Apple excludes any subscription-based mobile gaming service that has the potential of competing with Apple Arcade. By foreclosing all competition, Apple has extinguished Plaintiff's and the Class's freedom to choose between subscription services, caused reduced innovation and quality of service, and caused Plaintiff and the Class to pay more for Apple Arcade than they otherwise would have in a competitive market.

**IV.     The Relevant Market**

56.     The relevant market is the market for subscription-based mobile gaming services on iOS devices (the "iOS Subscription-Based Mobile Gaming Services Market"). This market is comprised of a single distribution channel, the App Store, which is the only way that iOS users may access subscription-based mobile gaming services.

---

[4] Nick Statt, *Apple confirms cloud gaming services like xCloud and Stadia violate App Store guidelines*, The Verge (Aug. 6, 2020), https://www.theverge.com/2020/8/6/21357771/apple-cloud-gaming-microsoft-xcloud-google-stadia-ios-app-store-guidelines-violations.

[5] Mark Gurman, *Apple's App Store Rules Limit Rival Gaming Services While Arcade Runs Free*, BLOOMBERG, (March 25, 2020), https://www.bloomberg.com/news/articles/2020-03-25/google-stadia-nvidia-geforce-microsoft-xcloud-not-on-apple-ios.

57.     Although Apple Arcade is available for iOS users in 175 countries and regions across the globe, the geographic scope is limited to the United States. [6]

**V.      Apple's Monopoly Power in the iOS Subscription-Based Mobile Gaming Services Market**

58.      Apple has monopoly power in the iOS Subscription-Based Mobile Gaming Services Market. This is because the App Store is the sole means by which subscription-based mobile gaming services are distributed to consumers in the market, *i.e.*, iOS device users.

59.     As the "gatekeeper" of the "walled garden" that is the App Store, Apple exercises complete control over the App Store. Developers seeking to distribute their apps on the App Store are required to follow Apple's stringent App Store Review Guidelines ("Guidelines") or risk Apple rejecting or removing their app from the App Store.

60.     No developer can distribute their subscription-based mobile gaming services to iOS users unless they agree to distribute their apps solely through the App Store and not to distribute third-party app stores. Moreover, Apple pre-installs its App Store on every iOS device it sells and disables iOS users' ability to remove the App Store from their devices. In other words, for a developer to distribute a subscription-based gaming services to iOS consumers, it must go through the App Store; to access the App Store, it must go through Apple.

61.     Further, there are no constraints on Apple's market power in the relevant market. Non-iOS subscription-based mobile gaming services do not constrain Apple's market power because they are not compatible with iOS devices, they cannot provide iOS users with apps for their devices, and they do not contain iOS compatible apps.

62.     App developers and publishers are likewise powerless to constrain Apple's conduct by refusing to develop and publish apps for iOS. There are at least 1 billion gaming iOS users. If a developer does not develop iOS apps, the developer forfeits all 1 billion of those customers. No

---

[6] A complete list of countries where Apple Arcade is available is attached hereto as Exhibit A. *See also* "Availability of Apple Media Services", APPLE, https://support.apple.com/en-us/HT204411 (last visited Sep. 11, 2020).

developer or group of developers have sufficient power to entice enough iOS users to leave iOS, such that developing apps solely for other platforms would be profitable.

63.     Indeed, developers are "acutely aware of [Apple's] power over [them]."[7] Explaining Facebook's decision to strip Facebook Gaming of its game-playing feature in order to gain access to the App Store, Facebook's Chief Operating Officer Sheryl Sandberg stated, "Facebook couldn't afford to ignore 50 percent of the smartphone market, not to mention iPad OS and the tablet-related market."[8] Put simply, developers cannot forgo iOS.

64.     If subscription-based mobile gaming service providers—like Microsoft, Facebook, and Google—cannot constrain Apple's market power, consumers are even more powerless to do so. Consumers that purchase an iOS device are locked into the iOS ecosystem and face substantial switching costs. If they want to switch OS, they must switch devices. Additionally, mobile OSs have different designs, controls, and functions that consumers must learn to navigate. Learning to use a different mobile OS is part of consumers' switching costs. Thus, users are unlikely to switch to another OS in order to access subscription-based mobile gaming content from other providers

65.     The loss of financial investment in various iOS devices and apps further deters users from switching OSs. Consumers often use one OS across their devices. That is, an iPhone user typically uses a Mac computer, an iPad, and/or an iPod, *i.e.*, all Apple devices. These devices feature the same types of designs, controls, and functions and typically sync with each other. If a user enters a date in the calendar on their Mac computer, the date is also entered into the calendar on their iPhone. Moreover, because apps are designed to operate on a specific OS, switching to a new mobile OS may mean losing access to iOS specific products and data.

_____

[7] Dominic Whitlock, Match Group *Welcomes EU's Probe Into Apple Commission Rates*, GLOBAL DATING INSIGHTS (Jun. 17, 2020), https://www.globaldatinginsights.com/news/match-group-welcomes-eus-probe-into-apple-commission-rates/.

[8] John P. Mello Jr., *Apple, Microsoft, Facebook Rumble Over Game Streaming Apps,* TECH NEWS WORLD            (Aug.            11,            2020). https://www.technewsworld.com/story/86797.html#:~:text=Late%20last%20week%2C%20Apple%20refused,streaming%20gaming%2C%20into%20the%20store.

**VI.    Apple's Anticompetitive Conduct in the iOS Subscription-Based Mobile Gaming Services Market**

66.    Apple imposes unreasonable restraints and willfully and unlawfully maintains its monopoly in the market for iOS Subscription-Based Mobile Gaming Services through several, related anticompetitive acts designed to exclude subscription-based mobile gaming services that compete with Apple Arcade. There are no procompetitive justifications for Apple's anti-competitive acts.

67.    Apple's unlawful conduct proximately caused injury and actual damages to Plaintiff and the Class.

**A.    Apple Imposes Technical Restrictions on iOS Devices.**

68.    Apple imposes technical restrictions that prevent iOS users from accessing subscription-based mobile gaming services other than Apple Arcade. By preventing iOS users access to any other app stores, Apple is able to maintain its "ironclad" control of the sole channel for distribution of subscription-based mobile gaming content. Complete control of the App Store therefore not only furthers but is ***essential*** to Apple's scheme to maintain its monopoly in the relevant market.

69.    First, Apple designed technical restrictions into iOS that prevent users from downloading app stores or apps directly from websites. Consequently, developers of subscription-based mobile gaming services must distribute apps through the App Store and consumers must use the App Store to download these apps to their iOS devices. There is no alternative.

70.    Second, Apple pre-installs the App Store on the home screen of every iOS device it sells and disables users' ability to uninstall the App Store. Apple does not permit any other app stores on iOS devices.

**B.    Apple Imposes Contractual Restrictions on Developers.**

71.    Apple also imposes contractual restrictions on developers that further its monopoly in the market for iOS Subscription-Based Mobile Gaming Services.

72.    First, in order to distribute subscription-based mobile gaming services to iOS consumers, all developers must agree to distribute their apps solely through the App Store.

73.     Section 3.2(g) of the Developer Agreement provides that apps "may be distributed only if selected by Apple (in its sole discretion) for distribution via the App Store, Custom App Distribution, for beta distribution through TestFlight, or through Ad Hoc distribution as contemplated in this Agreement[.]"[9] This provision ensures that the App Store is the only channel through which developers can distribute subscription-based mobile gaming services to the more than 1 billion person iOS userbase.

74.     Custom App Distribution, beta distribution through TestFlight, and Ad Hoc distribution are limited distribution channels that do not compete with the App Store.

75.     Custom App Distribution is the "store or storefront functionality that enables users to obtain Licensed Applications through the use of Apple Business Manager, Apple School Manager, or as otherwise permitted by Apple[.]"[10] Apple Business Manager and Apple School Manager are specialized programs that allow organizations to buy and distribute apps and content in bulk to their members or employees, and then manage their devices, apps, and accounts. Custom App Distribution does not allow developers to distribute subscription-based mobile gaming services to the general iOS userbase.

76.     Apple's beta testing program permits a developer to distribute non-final versions of apps, including subscription-based mobile gaming services, only to the developer's own personnel and beta testers for the sole purpose of coding and testing an app for use on the App Store. This program also does not allow developers to distribute apps to the general iOS userbase, and therefore does not compete with the App Store as a distribution channel.

77.     Ad Hoc distribution allows developers to distribute apps directly to the developer's own devices to facilitate development of apps for iOS. Ad Hoc distribution does not allow distribution to third parties. Ad Hoc distribution therefore does not allow distribution to the general iOS userbase and is not a competing distribution channel.

---

[9] *Apple Developer Agreement*, APPLE, (last visited Oct. 7, 2020), https://developer.apple.com/terms/apple-developer-agreement/.

[10] *Id.*

78.     Second, Apple prohibits developers from distributing their own, third-party app stores, as a way to prevent competition against its own subscription-based mobile gaming service. Section 3.3.2(b) of the Developer Agreement prohibits "Application[s]" that "create a store or storefront for other code or applications[.]"

79.     Apple also requires developers to follow its App Store Review Guidelines or risk removal of their apps from the App Store. Under the Guidelines, it is "[u]nacceptable" to create "an interface for displaying third-party apps, extensions, or plug-ins similar to the App Store or as a general-interest collection."[11]

80.     Developers are therefore contractually bound to distribute apps, including subscription-based mobile gaming services, only through the App Store. They cannot sidestep the App Store by offering their services through other app stores. They cannot sidestep the App Store by creating and distributing their own subscription-based mobile gaming services through other app stores. And they cannot sidestep the App Store by offering their services through any subscription-based mobile gaming services not on the App Store.

81.     Apple therefore further forecloses competition in the market for iOS Subscription-Based Mobile Gaming Services by preventing developers from distributing their gaming content, including subscription-based gaming content, anywhere but the App Store.

**C.      Apple Abuses its App Store Review Guidelines in order to Protect its Monopoly in the Market for iOS Subscription-Based Mobile Gaming Services.**

82.     As explained above, any developer or publisher seeking to distribute an app through the App Store must follow Apple's stringent App Store Review Guidelines. Apple uses its Guidelines strategically to exclude rival subscription-based mobile gaming services.

83.     Apple's Guidelines provide that Apple, in its sole discretion, can create new rules, at any time, for any reason. For example, Apple's introduction to its Guidelines state that Apple can

---

[11] *App Store Review Guidelines*, APPLE, (last visited Oct. 7, 2020), https://developer.apple.com/app-store/review/guidelines/.

1    "reject apps for any content or behavior that we believe is over the line. What line, you ask? Well
2    as a Supreme Court Justice once said, 'I'll know it when I see it.'"[12]

3    84.    Apple has arbitrarily applied its guidelines to exclude apps that compete with Apple's
4    own apps and services. Phillip Shoemaker, former Senior Director of App Store Review, explained
5    in an interview with congressional officials that Apple's senior executives would routinely find
6    "pretextual reasons" to remove apps from the App Store, "particularly when those apps competed
7    with Apple services."[13] Mr. Shoemaker further explained that apps that compete with Apple's
8    services have a "track record" of facing difficulty in getting through the App Store review process.[14]
9    Mr. Shoemaker admitted that this process gives Apple an unfair "advantage[] . . . over third-party
10   apps."[15]

11   85.    This is especially true in the market for subscription-based mobile gaming services.
12   Mr. Shoemaker specifically cited Apple Arcade as a primary example of Apple abusing its App
13   Store Review Guidelines. Specifically, Mr. Shoemaker explained that even though Apple Arcade
14   was a type of app "consistently disallowed from the store" when created by third-party developers,
15   it was a welcome addition to the App Store despite that it violated existing guidelines.[16] Even more
16   so, Mr. Shoemaker explained that Apple's latest guidelines were rewritten "specifically [to] exclude
17   Google Stadia," a rival to Apple Arcade.[17]

18   86.    The Guidelines also include specific provisions that block subscription-based mobile
19   gaming services in particular.

20   87.    For example, Guideline 4.7 permits gaming apps only if, *inter alia*, "code distribution
21   isn't the main purpose of the app, the code is not offered in a store or store-like interface, and

---

23   [12] *Id.*

24   [13] INVESTIGATION OF COMPETITION IN DIGITAL MARKETS, MAJORITY STAFF REPORT AND
25   RECOMMENDATIONS, SUBCOMMITTEE ON ANTITRUST, COMMERCIAL AND ADMINISTRATIVE LAW OF
     THE COMMITTEE ON THE JUDICIARY AT 367 (2020).

26   [14] *Id.* at 371.

27   [15] *Id.*

28   [16] *Id.*

     [17] *Id.*

provided that the software [] is free or purchased using in-app purchase."[18] In other words, if an app is anything more than a standalone game, such as a subscription-based mobile gaming service, Apple prohibits the app.

88.     Apple relied on this provision to deny Facebook Gaming access to the App Store. Apple only allowed Facebook Gaming to launch after it stripped the game-playing feature from its app.

89.     As another example, Apple's Guidelines ensure that Apple Arcade subscribers enjoy a more seamless and user-friendly experience than they would if using a competing subscription-based mobile gaming service. Guideline 3.1.2(a) provides that, "[g]ames offered in a streaming game service subscription must be downloaded directly from the App Store[.]"[19] That is, each game in a competing subscription-based mobile gaming service must be available for download as a separate app in the App Store. Consequently, while an Apple Arcade subscriber can navigate to the "Apple Arcade" section of the App Store and peruse and download all available games; a consumer subscribing to a competing service (if Apple had approved any such service for the App Store) would need to navigate the App Store themselves, without any convenient listing, and locate each individual game whenever they want to download a new game.

90.     Apple claims that this policy is necessary in order to allow Apple to review each game offered in its App Store for safety and privacy. Apple cited Microsoft's catalog listing as the very reason it rejected Microsoft's xCloud service. But as Microsoft pointed out, "All games available in the Xbox Game Pass catalog are rated for content by independent industry ratings bodies such as the ESRB and regional equivalents."[20] Following these statements by Microsoft, Apple

---

[18] *App Store Review Guidelines*, APPLE, (last visited Oct. 7, 2020), https://developer.apple.com/app-store/review/guidelines/.

[19] *Id.*; *see also* Guideline 4.9 (providing that each streaming game must have an individual App Store page).

[20] Nick Statt, *Microsoft condemns Apple's App Store policies*, THE VERGE (Aug. 6, 2020), https://www.theverge.com/2020/8/6/21358074/microsoft-xcloud-cloud-gaming-condemns-apple-app-store-rules-iphone-ios.

updated its Guidelines to explicitly require that "each [streaming] game must be submitted for review."[21]

91.     These examples confirm that Apple's decisions are entirely arbitrary and Apple abuses it's power as "gatekeeper" of the App Store to stifle rivals of Apple Arcade.

**D.     Apple Outright Rejected Competing Subscription-Based Mobile Gaming Services.**

92.     In perhaps its most flagrant anticompetitive act, when competing subscription-based mobile gaming services applied for approval for the App Store, Apple repeatedly rejected these services until the publishers either gave up or stripped their apps of key features that compete with Apple Arcade.

93.     On August 5, 2020, *The Verge* reported that Microsoft had cut testing for the iOS version of its subscription-based mobile gaming service, xCloud. Microsoft cut its iOS testing a month ahead of schedule.

94.     The next day, on August 6, *The Verge* reported that Microsoft's xCloud would launch its subscription-based mobile gaming service for a number of platforms, excluding Apple's App Store. Although Apple claimed that it rejected xCloud for violating Apple's policies. Microsoft placed the blame squarely on Apple, stating "Apple stands alone as the only general purpose platform to deny consumers from cloud gaming and game subscription services like Xbox Game Pass."[22]

95.     The same day, *The Verge* report confirmed that Apple rejected Google's Stadia for purported violations of Apple's policies.

96.     One day later, on August 7, 2020, The *New York Times* reported that Facebook worked for six months to obtain Apple's approval for Facebook Gaming. Facebook sought approval from Apple at least five times to release Facebook Gaming in the App Store. Apple finally approved

---

[21] *App Store Review Guidelines*, APPLE, (last visited Oct. 7, 2020), https://developer.apple.com/app-store/review/guidelines/.

[22] Nick Statt, *Apple confirms cloud gaming services like xCloud and Stadia violate App Store guidelines*, THE VERGE, (Aug. 6, 2020), https://www.theverge.com/2020/8/6/21357771/apple-cloud-gaming-microsoft-xcloud-google-stadia-ios-app-store-guidelines-violations.

Facebook Gaming in August 2020, only after Facebook removed key features of its app that compete directly with Apple Arcade. Sheryl Sandberg lamented that "iOS users [will] have an inferior experience to those using Android."[23] Facebook's vice president for gaming, Vivek Sharma, further explained that Apple's conduct creates "shared pain across the games industry, which ultimately hurts players and developers and severely hamstrings innovation on mobile for other types of formats like cloud gaming."[24]

97.     Apple has therefore foreclosed competition in the relevant market by either outright rejecting or approving only stripped-down versions of competing subscription-based mobile gaming services. Apple Arcade stands virtually alone in the relevant market.

## VII.   There are no Procompetitive Justifications for Apple's Misconduct

98.     Apple claims that it bans subscription-based mobile gaming services from the App Store because they violate various Guidelines. But these justifications are a pretext. As set forth above, Apple keeps these apps out of the App Store because they directly compete with Apple Arcade.

99.     Apple has primarily asserted that blocking these apps is necessary to enforce privacy and security safeguards. For example, Apple purported to block Facebook Gaming, Stadia, and xCloud in part because they are "cloud-based." Since the games are not downloaded individually from the App Store, but rather streamed from a remote server, the games cannot be subjected to individual review or "appear[] in charts and search" on the App Store.[25] Apple additionally claims

---

[23] Tom Warren, *Facebook slams Apple's App Store policies, launches Facebook Gaming on iOS without games*, THE VERGE, (Aug. 7, 2020), https://www.theverge.com/2020/8/7/21358355/facebook-apple-app-store-policies-comments-facebook-gaming-ios.

[24] Seth Schiesel, *Facebook Gaming Finally Clears Apple Hurdle, Arriving in App Store*, THE NEW YORK TIMES, (Aug. 7, 2020), https://www.nytimes.com/2020/08/07/technology/facebook-apple-gaming-app-store.html.

[25]     Nick Statt, *Apple confirms cloud gaming services like xCloud and Stadia violate App Store guidelines*, THE VERGE, (Aug. 6, 2020), https://www.theverge.com/2020/8/6/21357771/apple-cloud-gaming-microsoft-xcloud-google-stadia-ios-app-store-guidelines-violations.

1   that these apps violate its rule that prohibits apps with the "main purpose" of distributing causal

2   games.[26]

3       100.   Yet Apple allows Mac users to access several different distribution channels to

4   download software applications onto non-iPhone devices, such as Mac computers. For example,

5   users can download software onto their computers from developer websites as well as purchase apps

6   on third-party stores that compete with the App Store. There is no legitimate reason why this same

7   structure could not operate safely and securely on iOS devices.

8       101.   Although Apple has recently updated its Guidelines to expressly permit game

9   streaming services such as Stadia and Microsoft xCloud, Apple continues to impose restrictions that

10  prevent these services from meaningfully competing with Apple Arcade in any way. For example,

11  subscription-based mobile gaming services still must provide an individual page for each game

12  available in their libraries and each game must be downloaded individually from the App Store.

13  Games also still must use in-app purchases to unlock features and functionality. As a result,

14  competing subscription-based mobile gaming services are still prevented from offering a seamless

15  user experience.

16      102.   Apple also applies its Guidelines pretextually. As alleged herein, although Apple

17  cited the inability to review Microsoft xCloud games for safety and performance as a reason for

18  rejecting the xCloud App, Microsoft confirmed that all of the games available through xCloud are

19  rated for content by independent industry ratings bodies. Only after Microsoft pointed this out did

20  Apple change its Guidelines to specifically require that all games be submitted to Apple for

21  individual review. Apple's justification for rejecting xCloud is pretextual and provides no

22  procompetitive justification for excluding competitors.

23      103.   Apple also applies its app policies discriminatorily. For example, catalog apps, apps

24  that provide access to multiple items like digital magazine, newspapers, and videos, are allowed,

25  but gaming catalogs were not permitted until September 2020—after widespread criticism for

26  _____

27

28  [26]   Seth Schiesel, *Apple Rejects Facebook's Gaming App, for at Least the Fifth Time*, THE NEW
    YORK TIMES, (July 18, 2020), https://www.nytimes.com/2020/06/18/technology/apple-ios-
    facebook-gaming-app.html.

1  rejecting competing subscription-based mobile gaming services. Even now, users cannot download

2  games directly from a catalog app.

3        104.    Apple also famously carves out exceptions for major streaming and subscription

4  services such as Netflix and Amazon. These services are permitted to disable the ability to purchase

5  subscriptions in app or in some cases to direct users to a browser to make purchases. In contrast,

6  Microsoft has pointed out that Apple "consistently treats gaming apps differently . . . applying more

7  lenient rules to non-gaming apps."[27]

8        105.    Indeed, there is ample motivation for Apple to go the extra mile to foreclose

9  competition in the iOS Subscription-Based Mobile Gaming Services Market. As alleged herein,

10  mobile gaming is a multibillion-dollar industry and gaming apps are the most lucrative category of

11  the App Store. Apple stands to profit tremendously by keeping competitors out. As one writer

12  summarized, "[a]ny potential but unrealized App Store revenue can be quite significant given the

13  store's size and reach."[28]

14        106.    Apple has particular motivation to protect its monopoly in the iOS Subscription-

15  Based Mobile Gaming Services Market. Estimates projected that Apple Arcade would have 12

16  million subscribers by the end of 2020.

17        107.    Apple stands to lose millions if Apple Arcade is not successful. In June 2020,

18  Bloomberg reported that Apple had earmarked tens of millions of dollars for the creation of Apple

19  Arcade games and had spent at that time between one and five million dollars on several titles.

20  Combined with the projected subscription revenue, Apple has a significant interest in ensuring the

21  Apple Arcade is successful.

22

23

24

_____

25  [27] Tom Warren, *Facebook slams Apple's App Store policies, launches Facebook Gaming on iOS without games*, THE VERGE, (Aug. 7, 2020),
26  https://www.theverge.com/2020/8/7/21358355/facebook-apple-app-store-policies-comments-facebook-gaming-ios.

27  [28] Christian Zibreg, *Popular cloud gaming services cannot get their apps on the App Store under current rules,* iDB, (March 25, 2020),   https://www.idownloadblog.com/2020/03/25/game-
28  streaming-services-app-store-rules/.

108.    Thus, the timing and nature of Apple's conduct belie any procompetitive justification for Apple's rejection of competing services. Apple blocked its competitors not to protect consumers, but to maintain its monopoly in the market for iOS Subscription-Based Mobile Gaming Services and capitalize on its investment in Apple Arcade.

## VIII.    Anticompetitive Effects in the iOS Subscription-Based Mobile Gaming Services Market

109.    Apple has taken advantage of its dual role as both gatekeeper and market player, repeatedly abusing its monopoly power to prevent competition with Apple Arcade. Apple's anti-competitive conduct forecloses competition in the iOS Subscription-Based Mobile Gaming Market, affects a substantial volume of commerce in this market, and causes anticompetitive harms to consumers.

110.    First, Apple's conduct enables it to charge supracompetitive prices for Apple Arcade. Apple has used its complete control of iOS and the App Store to exclude all potential and actual competition in the iOS Subscription-Based Mobile Gaming Services Market. To date, Apple has refused to approve the majority of competing subscription-based mobile gaming services. Those that have been approved cannot meaningfully compete because, like Facebook Gaming, they are stripped of competing features like game-playing, or they are forced to offer an inferior user experience. By eliminating all competition, Apple has also eliminated price competition in the relevant market. Indeed, iOS users have no access to competitive pricing for subscription-based mobile gaming services because they have ***no options*** other than Apple Arcade. Apple Arcade subscribers thus pay more for Apple Arcade than they would have in a competitive market.

111.    Second, Apple's conduct extinguishes consumer choice. Apple's technical and contractual restrictions make it impossible for iOS users to access subscription-based mobile gaming services anywhere but the App Store. Apple alone determines what is available in the App Store. As described above, Apple has unlawfully and unfairly used its App Store Review Guidelines and outright rejection of competing services to ensure that Apple Arcade is the only subscription service available in the App Store where users can purchase and play both new and old and premium and freemium games. There is no other choice.

112.    Third, by excluding all competing services from the App Store through the means described above, Apple has restricted the output of iOS-compatible subscription-based mobile gaming services. But for Apple's conduct, more of these services, including xCloud and Stadia, would be available to iOS users through the App Store.

113.    Fourth, Apple's conduct prevents innovation. Apple's technical and contractual restrictions as well as App Store Review Guidelines prevent developers from innovating for iOS. As examples only, subscription-based mobile gaming services are prevented from experimenting with alternative ways to list their games in the App Store or developing methods of upgrading their game offerings other than through in-app purchases. The lack of competition also reduces pressure for Apple to innovate and improve its own Apple Arcade. Consumers are therefore denied the opportunity to experience new and innovative gaming subscription services and content.

114.    Finally, Apple's conduct reduces the quality of subscription-based mobile gaming services available to iOS users. For example, since Apple only approved Facebook Gaming after Facebook Gaming stripped its game-playing feature, iOS users miss out on that feature altogether. Similarly, iOS consumers can only download games as separate apps, rather than directly through a user-friendly catalog listing. As a Microsoft spokesperson recently described, "This remains a bad experience for customers. Gamers want to jump directly into a game from their curated catalog . . . and not be forced to download over 100 apps to play individual games [.]"[29] Thus, the quality of subscription-based mobile gaming services available to iOS users is significantly reduced.

115.    In sum, Apple's conduct has the effect of excluding any subscription-based mobile gaming service that could meaningfully compete with Apple Arcade. By foreclosing all competition, Apple has extinguished Plaintiff's and the Class's freedom to choose between subscription-based mobile gaming services, caused reduced innovation and quality of service, and caused Plaintiff and the Class to pay more for Apple Arcade than they otherwise would have in a competitive market.

---

[29] Kif Leswing, *Apple's App Store had gross sales around $50 billion last year, but growth is slowing*, CNBC Jan. 8, 2020,   https://www.cnbc.com/2020/01/07/apple-app-store-had-estimated-https://www.cnbc.com/2020/01/07/apple-app-store-had-estimated-gross-sales-of-50-billion-in-2019.html.

1    **IX.    Apple's History of Monopolistic Abuse**

2        116.    This is not Apple's first rodeo with respect to blocking competitor streaming and

3    subscription apps under the guise of enforcing its App Store Review Guidelines.

4        117.    Apple withheld approval from Valve's game streaming app, Steam Link, for nearly

5    a year before approving a stripped-down version of the app. Steam Link functions as a remote

6    desktop allowing users to stream games ***they have already purchased*** from their Steam library onto

7    a mobile phone using Wi-Fi or a cable. Apple cited "business conflicts with app guidelines" as the

8    reason for rejecting the app.[30] But, as Valve pointed out, Steam Link functioned exactly like

9    numerous other remote desktop applications available in the App Store.

10       118.    A month after Apple rejected Steam Link, Apple changed its Guidelines to permit

11   "remote mirroring apps, like Steam Link, to contain an app store so long as purchases through that

12   app store are processed on the desktop PC, and not on the iPhone or iPad itself."[31] Steam Link

13   subsequently removed the store function from its iOS app. Nevertheless, Apple did not approve

14   Steam Link for distribution on the App Store until a full year later.

15       119.    Apple has also been embroiled in an ongoing feud with Spotify, a music steaming

16   app, as well as a separate e-book app. The developers filed complaints with the European

17   Commission alleging that Apple's App Store Review Guidelines impacted their ability to compete

18   with Apple. Their apps compete directly with Apple Music and Apple Books. On June 16, 2020,

19   following the developers' complaints, the European Commission opened a formal investigation into

20   Apple to determine whether its conduct was causing harm to consumers by limiting their choices

21   and preventing them from benefiting from lower prices. "We need to ensure that Apple's rules do

22   not distort competition in markets where Apple is competing with other app developers," said

23   Margrethe Vestager, the European Commission executive vice president in charge of competition

24

25   _____

26   [30] Nick Statt, *Apple rejects Valve's Steam Link game streaming app over 'business conflicts'*, THE

27   VERGE (May 24, 2018), https://www.theverge.com/2018/5/24/17392470/apple-rejects-valve-steam-link-app-store-ios-game-steaming.

28   [31] *App Store Review Guidelines*, APPLE, (last visited Oct. 7, 2020), https://developer.apple.com/app-store/review/guidelines/.

policy.[32] The same day, the European Commission opened another antitrust investigation to assess whether Apple's conduct in connection with Apple Pay "distort[s] competition and reduce[s] choice and innovation."[33]

120.    Just this year, on June 16, 2020, *The Verge* reported that Apple threatened to remove "Hey.com", a new email subscription service offered by Basecamp. When Hey tried to introduce a bug fix, Apple told Basecamp to add an in-app subscription to prevent Hey from being removed from the App Store. Apple followed with a letter, citing App Store Review Guidelines that require in-app purchases for most apps with limited exceptions. Basecamp's Chief Technology Officer, David Heinemeier Hansson, responded to Apple's threat to remove Hey with outrage. He stated, "Apple has been capriciously, inconsistently, and in a few cases, cruelly, enforcing their App Store policies for YEARS."[34]

121.    Nor is this the first time Apple has abused its dominance in the tech industry. The following provide illustrative examples.

122.    In 2012, the DOJ and thirty-three states brought an antitrust suit against Apple and several major eBook publishers in the Southern District of New York, alleging that the companies had colluded in a price-fixing scheme. The plaintiffs accused Apple and the other companies of conspiring to restrain retail prices for e-books in order to compete against Amazon's price

[32] Adam Satariano and Jack *Nicas, Apple's App Store Draws Antitrust Scrutiny in European Union*, NEW YORK TIMES (Jun. 16, 2020), https://www.nytimes.com/2020/06/16/business/apple-app-store-european-union-antitrust.html.

[33] Press Release, *Commission opens investigation into Apple practices regarding Apple Pay*, European Commission (Jun. 16, 2020), *available at* https://ec.europa.eu/commission/presscorner/detail/en/ip_20_1075.

[34] Jacob Kastrenekas, *Hey.com exec says Apple is acting like 'gangsters,' rejecting App Store updates and demanding cut of sales*, THE VERGE (Jun. 16, 2020), https://www.theverge.com/2020/6/16/21293419/hey-apple-rejection-ios-app-store-dhh-gangsters-antitrust.

discounting model for selling e-books. Ultimately, the district court found "compelling evidence" illustrated that Apple played a "central role" in the price-fixing conspiracy.[35]

123.    In 2010, the DOJ brought an antitrust action against Apple and several other major Silicon Valley companies, such as Google and eBay, alleging that the companies had entered into a conspiracy not to poach each other's employees. The complaint alleged that the companies had entered into an agreement not to cold call employees of other major technology companies with employment opportunities. Apple and other defendants eventually agreed to pay over $400 million to settle the lawsuit.

124.    In 2009, the Federal Communications Commission ("FCC") investigated Apple when the company prevented users from downloading the Google Voice app from the App Store. Google Voice was a voicemail program that directly competed with Apple's own Visual Voicemail. Apple claimed that Google Voice ruined iPhone user experience, but eventually relented after the FCC initiated investigations. As of November 2010, Google Voice was available on the App Store once more.

125.    In 2010, Apple changed the Terms of Service for its software development kit, preventing developers for using coding languages that were not pre-approved by Apple. This rule prevented developers from using Adobe Animate or similar software to develop apps for Apple products. The Federal Trade Commission and the Department of Justice ("DOJ") both participated in an antitrust investigation against Apple related to the incident. In response to public outcry, Apple rolled-back the restrictions later that year.

126.    In 2019, Apple demanded changes from several apps that granted parental controls over Apple devices or tracked device usage. Apple went so far as to remove between eleven and seventeen of the most frequently downloaded of these apps. These apps directly competed with Apple's own parental control and device tracking apps. Apple attempted to justify its decisions by

---

[35]    Nate Raymond and Jonathan Stempel, *Apple colluded on e-bookprices, judge finds,* REUTERS (Jul. 10, 2013), https://www.reuters.com/article/us-apple-ebooks/apple-colluded-on-e-book-prices-judge-finds-idUSBRE9690GE20130710.

depicting the competing apps as a "privacy risk".[36] Two of these parental apps filed a complaint with the EU following Apple's decision to remove them from the App Store.

127.    On June 24, 2020, reports surfaced of a DOJ antitrust probe into Apple's "ironclad control of its App Store."[37] Then, in September 2020, the Italian and Australian antitrust authorities announced investigations into, among other things, the fairness of terms and conditions governing the iCloud and the app store.

128.    With this track record, it is not surprising that Apple has once again decided to wield the weight of its market power to illegally disadvantage its competitors to the detriment of consumers.

## **ANTITRUST INJURY**

129.    Plaintiff and class members have suffered antitrust injury as a direct result of Apple's unlawful conduct.

130.    By impairing competition in the iOS Subscription-Based Mobile Gaming Services Market, Apple's unlawful conduct has enabled it to extinguish consumer choice, hamper innovation and reduce quality, and charge supracompetitive prices in the relevant market.

131.    As a direct and proximate result of the unlawful conduct alleged herein, Apple has benefitted unjustly from the supracompetitive prices and profits on their sales of Apple Arcade subscriptions resulting from their unlawful and inequitable conduct, and have thus far retained the illegally obtained profits.

132.    Plaintiff and the Class are the direct purchasers of Apple Arcade. When Plaintiff and the Class purchased Apple Arcade, they did so directly through the App Store and paid Apple directly, using their credit card or other payment sources.

---

[36] Michael Grothaus, *Apple restricted Screen Time-like apps due to concerns over children privacy*, FASTCOMPANY (Apr. 29, 2019), https://www.fastcompany.com/90341325/apple-restricted-screen-time-like-apps-due-to-concerns-over-children-privacy.

[37] Leah Nylen, *Apple's easy ride from U.S. authorities may be over*, POLITICO (Jun. 24, 2020), https://www.politico.com/news/2020/06/24/justice-department-anti-trust-apple-337120.

1

## **CLASS ACTION ALLEGATIONS**

2      133.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23

3   individually and on behalf of the following Class:

4          All persons residing within the United States who directly paid a subscription fee to
5          Apple for Apple Arcade from September 19, 2019 through such time as the
           anticompetitive effects of Apple's anticompetitive conduct ceases (the "Class
6          Period").[38]

7      134.    Excluded from the Class are: (1) any Judge or Magistrate presiding over this action

8   and any members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors,

9   predecessors, and any entity in which Defendants or its parent has a controlling interest and their

10  current or former employees, officers, and directors; (3) persons who properly execute and file a

11  timely request for exclusion from the Class; (4) persons whose claims in this matter have been

12  finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's

13  counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

14     135.    **Ascertainability:** Membership of the Class is defined based on objective criteria,

15  and individual members will be identifiable from Defendant's records.

16     136.    **Numerosity:** The exact number of members of the Class is unknown and unavailable

17  to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists

18  of millions of individuals, and the members can be identified through Defendants' records.

19     137.    **Predominant Common Questions:** The Class' claims present common questions

20  of law and fact, and those questions predominate over any questions that may affect individual Class

21  members. Common questions for the Class include, but are not limited to, the following:

22              a.      Whether Apple's conduct constitutes a violation of the federal antitrust laws;

23              b.      Whether the U.S. market for iOS Subscription-Based Mobile Gaming

24                      Services, as defined herein, constitutes a relevant market;

25

26

27  _____

28  [38]    Plaintiffs have defined the Class based on currently available information and hereby reserve
        the right to amend the definition of the Class, including, without limitation, the Class Period

1        c.      Whether Apple possesses sufficient market power in the relevant market to

2             cause anticompetitive effects;

3        d.      Whether Apple possesses monopoly power in the relevant market;

4        e.      Whether Apple's conduct caused anticompetitive effects in the relevant

5             market;

6        f.       Whether Apple's conduct excluded other market participants in the relevant

7             market;

8        g.      Whether Apple maintains an illegal monopoly in the United States iOS

9             Subscription-Based Mobile Gaming Services Market;

10       h.      Whether Apple's conduct caused Plaintiff and the Class to pay

11           supracompetitive prices for Apple Arcade;

12       i.       Whether Apple's conduct has harmed or at least not benefited consumers;

13       j.       Whether Apple was unjustly enriched to the detriment of the Class;

14       k.      Whether the Class is entitled to restitution and/or disgorgement; and

15       l.       The appropriate classwide measure of damages.

16    138.   **Typicality:** Plaintiff's claims are typical of the claims of the other members of the proposed Class. Defendants' conduct that gave rise to Plaintiff claims and the members of the Class is the same for all members of the Class.

19    139.   **Adequate Representation:** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including antitrust violations. Plaintiff has no interest that is antagonistic to those of the Class, and Defendant has no defenses unique to any Plaintiff. Plaintiff and his/her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor his/her counsel have any interest adverse to those of the other members of the Class.

26    140.   **Substantial Benefits:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action

1  presents fewer management difficulties than individual litigation, and provides the benefits of single

2  adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment

3  will create economies of time, effort, and expense and promote uniform decision-making.

4       141.   Plaintiff reserves the right to revise the foregoing class allegations and definitions

5  based on facts learned and legal developments following additional investigation, discovery, or

6  otherwise.

7                                **CLAIMS FOR RELIEF**

8                             **FIRST CLAIM FOR RELIEF**
        **Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)**
9                              **Monopoly Maintenance**

10      142.   Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with

11  the same force and effect as if fully restated herein.

12      143.   The iOS Subscription-Based Mobile Gaming Services Market is the relevant market.

13  There are no reasonably interchangeable services for iOS Subscription-Based Mobile Gaming

14  Services Market.

15      144.   Apple has monopoly power in the iOS Subscription-Based Mobile Gaming Services

16  Market. Apple has the power to control price and exclude competition in the relevant market.

17  Indeed, Apple is the only entity who can distribute subscription-based mobile gaming services on

18  iOS.

19      145.   Apple unlawfully maintains its monopoly in the iOS Subscription-Based Mobile

20  Gaming Services Market through several related anticompetitive acts, including but not limited to,

21  imposing technical and contractual restraints on iOS, applying its App Store Review Guidelines to

22  foreclose competition, and refusing to approve competing services for the App Store, all of which

23  allow Apple to prevent the distribution of iOS subscription-based mobile gaming services apps that

24  pose a threat to Apple Arcade.

25      146.   Apple's conduct affects a substantial amount of interstate commerce.

26      147.   Apple's conduct has substantial anti-competitive effects, including but not limited

27  to, increased prices, stymied innovation, reduced quality, and limited choice for consumers in the

28  market for subscription-based mobile gaming services.

148.    As consumers who subscribed to Apple Arcade, Plaintiff and Class members have been and will continue to be harmed by Apple's anticompetitive conduct in a manner that the antitrust laws were designed to prevent. Plaintiff and Class members have paid and will continue to pay more for Apple Arcade than they would have in a competitive market.

**SECOND CLAIM FOR RELIEF**
**Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)**
**Denial of Essential Facility**

149.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

150.    The iOS Subscription-Based Mobile Gaming Services Market is the relevant market.

151.    Apple has monopoly power in the iOS Subscription-Based Mobile Gaming Services Market.

152.    Apple unlawfully maintains its monopoly power in the iOS Subscription-Based Mobile Gaming Services Market through its unlawful denial to other subscription-based mobile gaming services distributors of an essential facility—access to iOS and the App Store—which prevents them from competing in the iOS Subscription-Based Mobile Gaming Services Market.

153.    Apple possesses complete control over iOS and the App Store, both of which are essential to effective competition in the iOS Subscription-Based Mobile Gaming Services Market.

154.    Subscription-based mobile gaming services distributors are unable to duplicate Apple's iOS.

155.    Subscription-based mobile gaming services distributors are unable to access the access the App Store without explicit permission and approval from Apple.

156.    It is technically feasible for Apple to provide access to iOS and the App Store to other subscription-based mobile gaming services distributors, and it would not interfere with or significantly inhibit Apple's ability to conduct its business.

157.    Apple's denial of access to iOS has no legitimate business purpose, and serves only to assist Apple in maintaining its unlawful monopoly position in the iOS Subscription-Based Mobile Gaming Services Market.

158.    Through its denial of its essential facilities, Apple maintains its monopoly power in the iOS Subscription-Based Mobile Gaming Services Market.

159.    Apple's conduct affects a substantial volume of interstate commerce.

160.    Apple's conduct has substantial anti-competitive effects, including but not limited to, increased prices, reduced innovation and quality, and limited choice for consumers in the market for subscription-based mobile gaming services.

161.    As consumers who subscribed to Apple Arcade, Plaintiff and Class members have been and will continue to be harmed by Apple's anticompetitive conduct in a manner that the antitrust laws were designed to prevent. Plaintiff and Class members have paid and will continue to pay more for Apple Arcade than they would have in a competitive market.

**THIRD CLAIM FOR RELIEF**
**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**Unreasonable Restraint of Trade**

162.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

163.    Section 1 of the Sherman Act prohibits "every contract . . . in restraint of trade or commerce among the several States." See 15 U.S.C. § 1.

164.    The iOS Subscription-Based Mobile Gaming Services Market is a relevant market. There are no reasonably interchangeable services for iOS Subscription-Based Mobile Gaming Services.

165.     To reach iOS users, Apple forces developers of subscription-based mobile gaming services developers to comply with its Development Agreement and App Store Review Guidelines, including the requirement that iOS developers distribute their apps exclusively through the App Store.

166.    By conditioning access to iOS users on the Development Agreement and App Store Review Guidelines, Apple prevents developers from releasing subscription-based gaming services to iOS users that threaten Apple Arcade. This constitutes an unreasonable restraint of competition and trade.

167.    Apple's contractual restraints serve no legitimate or pro-competitive purpose that could justify its anti-competitive effects.

168.    Apple's contractual restraints have substantial anti-competitive effects, including but not limited to, increased prices, reduced innovation and quality, and limited choice for consumers in the market for subscription-based mobile gaming services.

169.    As consumers who subscribed to Apple Arcade, Plaintiff and Class members have been and will continue to be harmed by Apple's anti-competitive conduct in a manner that the antitrust laws were designed to prevent. Plaintiff and Class members have paid and will continue to pay more for Apple Arcade than they would have in a competitive market.

**FOURTH CLAIM FOR RELIEF**
**Violation of the California Cartwright Act**
**Unreasonable Restraint of Trade**
**Cal. Bus. & Prof. Code § 16700 *et seq.***

170.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

171.    Apple's acts and practices as detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See id*. §§ 16720, 16726.

172.    Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

173.    The iOS Subscription-Based Mobile Gaming Services Market is the relevant market.

174.    Apple has monopoly power in the iOS Subscription-Based Mobile Gaming Services Market.

175.    Apple forces developers of subscription-based mobile gaming services developers to agree to the terms contained in its Developer Agreement, including that iOS developers distribute their apps solely through the App Store. Section 3.2(g) of the Developer Agreement contains the requirement that developers distribute their apps exclusively through the App Store. Apple also conditions subscription-based mobile gaming services developers' access to iOS on their agreement

not to distribute third-party app stores. Section 3.3.2(b) of the Developer Agreement prohibits "Application[s]" that "create a store or storefront for other code or applications[.]" These provisions unreasonably restrain competition in the iOS Subscription-Based Mobile Gaming Services Market.

176.    These challenged provisions have no legitimate or procompetitive purpose or effect, and unreasonably restrain competition in the iOS Subscription-Based Mobile Gaming Services Market.

177.    Apple's conduct and practices have substantial anti-competitive effects, including increased prices, hampered innovation, and reduced quality of service in the market for subscription-based mobile gaming services.

178.    It is appropriate to bring this action under the Cartwright Act because many of the affected consumers reside in California, Apple has its principal place of business in California, and overt acts in furtherance of Apple's anticompetitive scheme took place in California.

179.    As a result of Apple's unlawful and unfair conduct, Plaintiff and Class members have been and will continue to be harmed by Apple's anti-competitive conduct. Plaintiff and Class members have paid and will continue to pay more for Apple Arcade than they would have in a competitive market.

**FIFTH CLAIM FOR RELIEF**
**Violation of California Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code § 17200 *et seq.***

180.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

181.    Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

182.    Apple's conduct as alleged herein constitutes unlawful or unfair business acts or practices as prohibited by the UCL.

183.    Apple's conduct constitutes unlawful or unfair business acts or practices, in that Apple has violated § 16700 *et seq*., as set forth above.

184.    Apple's conduct as alleged herein, including unlawfully eliminating all competition in the relevant market, otherwise constitutes unlawful or unfair business acts or practices as prohibited by the UCL.

185.    As a result of Apple's unlawful and unfair conduct, Plaintiff and Class members were injured in their business and/or property because they paid more for Apple Arcade than they would have in a competitive market.

186.    In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiff and Class members seek an order enjoining Apple from continuing to conduct business through unlawful or unfair acts and practices.

187.    Plaintiff and the Class also seek an order for the disgorgement and restitution of all monies from the sale of Apple Arcade, which were unjustly acquired through acts of unlawful or unfair competition.

## SIXTH CLAIM FOR RELIEF
### Unjust Enrichment

188.    Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

189.    Apple received benefits from Plaintiff and Class members and unjustly retained those benefits at their expense.

190.    In particular, Apple received benefits from Plaintiff and Class members in the form of supracompetitive prices for Apple Arcade. Apple's financial benefits resulting from its unlawful and inequitable conduct are economically traceable to overpayments for Apple Arcade by Plaintiff and Class members

191.    Additionally, Apple used its restrictive Developer Agreement and App Store Review Guidelines and rejected competitor subscription-based mobile gaming services to exclude actual and potential competition for its own gain, providing Apple with economic, intangible, and other benefits, including an unfair economic advantage over its competitors.

192.    Apple unjustly retained those benefits at the expense of Plaintiff and Class members because Apple's conduct damaged Plaintiff and Class members, all without providing any commensurate compensation to Plaintiff and the Class.

193.    The benefits that Apple derived from Plaintiff and Class members rightly belong to Plaintiff and Class members. It would be inequitable under unjust enrichment principles in California and every other state for Apple to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

194.    Apple should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class members all unlawful or inequitable proceeds it received, and such other relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff individually and on behalf of the Class, respectfully requests that the Court:

A.    Certify the Class pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure and order that notice be provided to all Class members;

B.    Designate Plaintiff as representative of the Class and the undersigned counsel as Class Counsel;

C.    Award Plaintiff and the Class compensatory damages in an amount to be determined by the Court and treble and punitive damages to punish Apple's egregious conduct as described herein, and to deter Apple and others from engaging in similar conduct;

D.    Award Plaintiff and the Class injunctive relief, as permitted by law or equity, including enjoining Apple from continuing the unlawful practices set forth herein;

E.    Award Plaintiff and the Class statutory interest and penalties;

F.    Award Plaintiff and the Class their costs, prejudgment and post judgment interest, and attorneys' fees;

G.    Order disgorgement and restitution;

H.    Establish a constructive trust into which Apple's ill-gotten gains shall be disgorged and from which Plaintiff and members of the Class may obtain restitution; and

I.    Grant such other relief that the Court may deem just and proper.

1

## <u>DEMAND FOR JURY TRIAL</u>

2          Plaintiff demands a trial by jury for all issues so triable.

3

4    Dated: October 8, 2020                    **BERMAN TABACCO**

5                                              By:   _/s/ Todd A. Seaver_
6                                                      Todd A. Seaver (SBN 271067)

7                                              44 Montgomery Street, Suite 650
                                               San Francisco, CA  94104
8                                              Telephone: (415) 433-3200
                                               Facsimile: (415) 433-6382
9                                              Email:  tseaver@bermantabacco.com

10                                             Vincent Briganti (pro hac vice forthcoming)
                                               Christian Levis (*pro hac vice* forthcoming)
11                                             Peter A. Barile III (*pro hac vice* forthcoming)
                                               Amanda Fiorilla (*pro hac vice* forthcoming)
12                                             Noelle Feigenbaum (*pro hac vice* forthcoming)
                                               **LOWEY DANNENBERG, P.C.**
13                                             44 South Broadway, Suite 1100
                                               White Plains, NY 10601
14                                             Telephone: (914) 997-0500
                                               Facsimile: (914) 997-0035
15                                             vbriganti@lowey.com
                                               clevis@lowey.com
16                                             pbarile@lowey.com
                                               afiorilla@lowey.com
17                                             nfeigenbaum@lowey.com

18

19                                             *Attorneys for Plaintiff and the Proposed Class*

20

21

22

23

24

25

26

27

28